[No. 3089-1.   Division One.   April 4, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. BOLDEN ELDRIDGE, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. HENRY CLAY TOLLET, *Defendant*, BOLDEN ELDRIDGE, *Appellant*.

---

*Bruce G. Hand,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Paul Bernstein, Deputy,* for respondent.

JAMES, J.—Defendant Bolden Eldridge was first tried to a jury and found guilty of first–degree assault, attempted second–degree burglary while armed with a firearm, and with being a felon in possession of a firearm. In a second trial, he was tried to the bench and found guilty of violating the Uniform Controlled Substances Act. By stipulation, his appeals were consolidated. We affirm his first trial conviction. Since no written findings of fact and conclusions of law were entered after the second nonjury trial, we remand for the entry of appropriate findings and conclusions.

Eldridge's 12 assignments of error raise the following six issues. Issue No. 1 is whether both trials should have been barred by reason of double jeopardy. Issue No. 2 concerns Eldridge's competency to stand trial on the assault, attempted burglary and firearm charges. Issue No. 3 is whether Eldridge was prejudiced at that trial by the judge's refusal to submit his proposed instruction and proposed special verdict form on mental irresponsibility and by the instruction to the jury to disregard the issue of mental irresponsibility. The fourth issue, again relating to the same trial, concerns whether the trial judge erred when he refused to permit Eldridge to cross–examine the State's psychiatrist respecting the effect of drug addiction on brain damage and on Eldridge's ability to formulate specific intent.

Issues Nos. 5 and 6 relate to Eldridge's conviction for violating the Uniform Controlled Substances Act. The fifth issue concerns what must be done by reason of the trial judge's failure to enter findings of fact and conclusions of law. The sixth and final issue concerns whether evidence

was seized as the result of an unlawful search and seizure.

On March 27, 1973, Eldridge was stopped by police for crossing a street against a light. A routine check revealed an outstanding warrant for his arrest in connection with a prior pedestrian violation. The officers testified that, as they were preparing to give Eldridge a pat–down search in connection with his arrest on· the outstanding warrant, he dropped a tinfoil package to the ground. It contained Ritalin tablets. Eldridge was later charged by information with violating the Uniform Controlled Substances Act.

On April 11, 1973, Eldridge was arrested in connection with an attempted burglary and shoot–out with police. He was subsequently charged by information with first–degree assault, attempted second–degree burglary while armed with a firearm, and being a felon in possession of a firearm.

As to all charges, Eldridge filed a special plea of mental irresponsibility and diminished capacity. A hearing was held on June 21 to determine his· capacity to stand trial. The State submitted a report by its chosen psychiatrist who concluded Eldridge was competent to stand trial and that he understood what he was doing at the time of the crimes. Eldridge's chosen psychiatrist had not yet examined him.

On Wednesday, June 27, Eldridge went to trial on all charges before Judge Lloyd Bever. During selection of the jury, one juror indicated that it would be a burden for her to be sequestered because she had children to take care of and a ceramics course to teach on the weekend. She added she would be willing to stay if she had to and that having to stay would not affect her judgment. The jury was finally chosen and sworn by late afternoon of Thursday, June 28. It was excused for a moment. The balance of the jurors not chosen remained in the courtroom. Eldridge then in open court unexpectedly refused to consent to a separation of the jury.[1] His codefendant (who was involved in the attempted

---

[1] As of June 28, 1973, juries had to be sequestered unless both defendant and the State consented to separation. RCW 10.49.110. CrR 6.7, which superseded this statute and changed the rule, did not take effect until July 1, 1973.

burglary and shoot–out) agreed to separation. A motion to sever the trials of the two defendants was denied. The State then withdrew its consent to separation. A discussion took place in which the trial judge considered whether substitute jurors could be chosen from among those remaining in the courtroom. It was apparent, however, that these potential jurors knew that Eldridge was responsible for the sequestration of the jury. Given the lateness of the hour, another venire could not be obtained until the next morning and probably not until Monday morning—3 full days away. Ultimately, Judge Bever decided against this course of action, and the potential jurors were excused. The jury was called back into the jury box. The judge informed them that they would have to be sequestered for the duration of the trial. The juror who originally complained, again complained. One other juror also complained, though no reason was expressed respecting how sequestration would work a hardship. Judge Bever then granted Eldridge's codefendant's motion for a mistrial. Eldridge did not join in the motion.

On August 22, 1973, Eldridge was again brought to trial before Judge George Revelle on the same charges except that the controlled substances charge had been severed for trial at a later date. Eldridge moved for dismissal of all charges on the basis of double jeopardy. The motion was denied. Subsequently, Judge Revelle held a brief competency hearing. He considered the earlier report by the State's psychiatrist as well as a report by Eldridge's psychiatrist which concluded he was competent to stand trial and comprehended the nature of the acts committed giving rise to the charges. Trial proceeded.

Following the close of testimony, Eldridge's proposed instruction and proposed special verdict form on mental irresponsibility and insanity were refused and the jury was instructed to disregard those issues. Eldridge was found guilty.

On October 15, 1973, Eldridge went to trial before Judge Frank Howard on the Uniform Controlled Substances Act violation. He was tried to the bench and the judge made an oral finding of guilt, but no findings of fact and conclusions of law were entered.

Eldridge first contends that the double jeopardy clause of the fifth amendment to the United States Constitution barred the State from prosecuting him following Judge Bever's declaration of a mistrial without his consent. We do not agree.

■ A fundamental ideal guaranteed by the United States Constitution is that no person shall be subject to being twice placed in jeopardy for the same offense. It is applicable to the states under the due process clause of the fourteenth amendment to the United States Constitution. *Benton v. Maryland,* 395 U.S. 784, 793, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969). The same protection is afforded defendants in criminal cases under our State constitution. Const. art. 1, § 9.

In characterizing the purpose of the double jeopardy clause, the United States Supreme Court stated in *Green v. United States,* 355 U.S. 184, 187–88, 2 L. Ed. 2d 199, 78 S. Ct. 221, 61 A.L.R.2d 1119 (1957):

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . . The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

■ The beginning point of any analysis of a double jeopardy claim is to determine whether jeopardy has attached. *Illinois v. Somerville,* 410 U.S. 458, 35 L. Ed. 2d

425, 93 S. Ct. 1066 (1973); *State v. Smith,* 15 Wn. App. 725, 551 P.2d 765 (1976). Here, although counsèl had not made their opening remarks and no witnesses had been called, jeopardy had nevertheless attached since the jury had been selected and sworn. *Downum v. United States,* 372 U.S. 734, 10 L. Ed. 2d 100, 83 S. Ct. 1033 (1963). Once jeopardy has attached, it is necessary to determine whether a retrial is barred. A trial judge's decision to declare a mistrial without the defendant's consent after jeopardy has attached but before the jury reaches a verdict will not in every instance bar retrial. *Illinois v. Somerville, supra; Gori v. United States,* 367 U.S. 364, 6 L. Ed. 2d 901, 81 S. Ct. 1523 (1961); *State v. Bishop,* 6 Wn. App. 146, 491 P.2d 1359 (1971).

The fountainhead decision construing the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection is *United States* v. *Perez,* 9 Wheat. 579 (1824).

*Illinois v. Somerville, supra* at 461. In writing for a unanimous court in *Perez,* Mr. Justice Story stated:

We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office.

*United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165 (1824). The trial judge is thereby vested with broad

discretionary power to determine whether a trial should be aborted prior to verdict.

Since *Perez,* the United States Supreme Court has consistently reaffirmed this broad discretionary power. *Illinois v. Somerville, supra.* The court has also consistently declined to apply any mechanical rule when evaluating a defendant's claim that a trial judge has abused discretion in aborting a case. It has,

> for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial.

*United States v. Jorn,* 400 U.S. 470, 480, 27 L. Ed. 2d 543, 91 S. Ct. 547 (1971).

Nevertheless, it has, on at least two occasions, over vigorous dissent, held that a trial judge abused discretion in aborting a trial. Significantly, in neither instance was there "bad–faith conduct by judge or prosecutor," *United State v. Jorn, supra* at 485, threatening "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. *Downum v. United States, supra* at 736. In *Downum v. United States, supra,* a key prosecution witness was unavailable. Due to prosecutorial inadvertence, the witness had not been located before trial, had not been served with a subpoena, and his whereabouts were then unknown. The prosecutor asked that the jury be discharged. Downum objected and moved for dismissal of the two counts (he was charged with six) for which the witness' testimony was essential. The trial judge discharged the jury. The United States Supreme Court held that in view of the circumstances, there was no manifest necessity to declare a mistrial. Downum was entitled to have his trial completed by the jury of his choice. In *United States v. Jorn, supra,* the trial judge declared a mistrial because he believed prosecution witnesses would be incriminating themselves on the stand and they had not been informed of their rights nor been given an opportunity to

obtain counsel. The United States Supreme Court concluded that aborting the trial was not necessary since a continuance could have obtained the same objective—namely, protecting the rights of the witnesses. In both cases, the court emphasized that the discretion to declare a mistrial after jeopardy has attached should be exercised only when manifestly necessary to serve the ends of public justice because a defendant has a "valued right to have his trial completed by a particular tribunal . . ." *Wade v. Hunter,* 336 U.S. 684, 689, 93 L. Ed. 974, 69 S. Ct. 834 (1949).

In the present case, the record reveals that two of the jurors expressed displeasure at the prospect of having to remain sequestered during the trial. They could not be replaced as there were no alternates. It is evident that the trial judge was concerned that the jurors, who had not expected to remain sequestered, might well be unfavorably disposed toward either the defendant or the prosecution. They might have poisoned other jurors' attitudes as well. Under these circumstances, he acted in order to assure a fair trial, not only for Eldridge but for his codefendant and the prosecution as well. He was present and in a far better position than we are to evaluate the complaining jurors' attitudes. We cannot say, as it was possible to say in *Downum* and *Jorn,* that an alternative course of action would have protected Eldridge's "valued right" to be tried by the jury of his choosing. We, therefore, hold that the trial judge did not abuse discretion in declaring a mistrial. The double jeopardy clause did not bar reprosecution of Eldridge.

Eldridge next contends that he was prejudiced when the trial judge denied his motion for a continuance during an abbreviated competency hearing at the outset of the second trial on assault, attempted burglary and firearm charges so that an inquiry could have been conducted into his competency to stand trial. We do not agree.

Specifically, Eldridge points out that his counsel had advised the court that he was having great difficulty communicating with Eldridge in that Eldridge could not apparently sustain a train of thought for any significant length of time. His codefendant testified that Eldridge was experiencing difficulty communicating with others, could not keep track of time, and could not remain awake. Eldridge was also being administered methadone each day after proceedings terminated. He argues that his conduct raised a "substantial question of possible doubt" as to his competency to stand trial.

▮ Competency to stand trial is a fundamental requirement of criminal justice.

An accused is competent to stand trial only "if he is capable of properly understanding the nature of the proceedings against him and if he is capable of rationally assisting his legal counsel in the defense of his cause." *State v. Gwaltney*, 77 Wn.2d 906, 907, 468 P.2d 433 (1970).

*State v. Nabors*, 8 Wn. App. 199, 201, 505 P.2d 162 (1973). In 1973, Washington legislatively established the procedure for determining competency. RCW 10.77. The determination is to be made by the court.

Here, Eldridge had been examined by two psychiatrists. One was approved by the State; the other by Eldridge. Their reports complied in substance with the requirements of the statute. Each doctor concluded that Eldridge was competent to stand trial and that he was sane at the time of the crimes. The trial judge considered these reports and conducted a hearing into Eldridge's ability to understand his peril and to rationally assist his counsel in his defense. He observed Eldridge's appearance and demeanor. Finally, he exercised his discretion and concluded that no sufficient basis existed upon which to grant Eldridge's motion.

For obvious reasons, the determination of competency to stand trial is a decision in which the trial judge must be afforded discretion. A trial judge's determination should not be disturbed by an appellate court absent an abuse of

discretion. We have reviewed the record including Eldridge's subsequent trial testimony and find no evidence that Eldridge was not competent. We find no abuse of discretion.

■ Eldridge's next contention is that the trial judge erred when he refused Eldridge's proposed instruction and proposed special verdict form on mental irresponsibility. In addition, he argues that he was prejudiced when the trial judge instructed the jury to disregard the issue of mental irresponsibility. We do not agree.

> When the plea of insanity or mental irresponsibility is interposed, the burden is on the defendant to prove that defense by a preponderance of the evidence. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Putzell,* 40 Wn.2d 174, 242 P.2d 180 (1952). Accordingly, if defendant wishes the issue of his insanity or mental irresponsibility put to the jury, he must present evidence to support it; if he fails to do so, the court ought not submit that issue to the jury, for it is improper to submit an issue to the jury or instruct as to a theory of a case unless there is evidence to prove it. *State v. Jackson,* 70 Wn.2d 498, 424 P.2d 313 (1967); *State v. Rio,* 38 Wn.2d 446, 230 P.2d 308 (1951).

*State v. Piche,* 71 Wn.2d 583, 588–89, 430 P.2d 522 (1967). Eldridge introduced no substantial evidence at trial which could sustain a finding of insanity or mental irresponsibility. Although he testified to having overdosed five times on heroin, he did not link those incidents to the crimes charged. In fact, he testified that he took no drugs on the day of the crimes. In addition, the State's psychiatrist testified that Eldridge was sane at the time of the crimes, could distinguish between right and wrong, and was not psychotic. The trial judge, therefore, did not err in refusing Eldridge's proposed instruction and proposed special verdict form. The trial judge correctly instructed the jury to disregard the issue of mental irresponsibility.

Eldridge finally contends that the trial judge erred when he sustained the State's objection to cross–examination of the State's psychiatrist respecting the possible effects of

drug addiction on the brain and its ability to formulate specific intent. We do not agree.

The psychiatrist had not performed any previous tests on the extent, if any, of brain damage suffered by Eldridge as a result of his addiction. The question was speculative, at best. The question was not phrased in hypothetical terms. There was no proper foundation. There was no offer of proof. There was no evidence that Eldridge's brain was damaged. The trial judge quite properly sustained objection to this line of questioning.

With respect to his conviction for violating the Uniform Controlled Substances Act, Eldridge points out that no written findings of fact and conclusions were entered although the trial judge did make an oral finding of guilt beyond a reasonable doubt and of the facts necessary to support such a finding. We cannot consider the merits of Eldridge's appeal since we have no written findings of fact to review. *State v. Russell*, 68 Wn.2d 748, 415 P.2d 503 (1966). Accordingly, we vacate the judgment and sentence and remand the cause for entry of findings of fact and conclusions of law. *State v. Wilks*, 70 Wn.2d 626, 424 P.2d 663 (1967).

The judgment is otherwise affirmed.

FARRIS, C.J., and SWANSON, J., concur.

Petition for rehearing denied August 30, 1977.

Review by Supreme Court pending February 3, 1978.