[No. 5608-1. Division One. January 2, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY JAMES TAYLOR, *Appellant*.

*Robert C. Boruchowitz* of *Seattle–King County Public Defender Association,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney, Betsy Hollingsworth, Deputy,* and *Richard Birinyi* and *Alan S. Paja, Legal Interns,* for respondent.

JAMES, J.—Defendant Gary James Taylor was convicted of two counts of first–degree murder. On appeal, he challenges his convictions and the imposition of two consecutive life terms. We affirm.

On August 21, 1974, an elderly couple were found shot and killed in their home. The couple's dog had also been killed and the home had been ransacked and burned. Taylor and a codefendant were arrested and brought to

trial on two counts of first–degree murder and one count of first–degree arson.

After the prosecution made its opening statement, plea bargaining resulted in Taylor's entering pleas of guilty to one count of first–degree murder and one count of second-degree murder. The arson charge was dismissed with prejudice.

Taylor subsequently petitioned to withdraw his guilty pleas. His petition was denied and he was sentenced to life imprisonment on each count. The terms were to run concurrently.

This court granted Taylor's petition for post–conviction relief pursuant to former CrR 7.7.[1] Upon remand, a superior court judge found that Taylor had been given erroneous advice concerning mandatory minimum terms and vacated the convictions and sentences.

On retrial, the State filed an information which again charged Taylor with two counts of first–degree murder and one count of first–degree arson. Both Taylor and a companion (codefendant at the first trial) testified at the second trial. They testified that, although Taylor was present at the scene, his participation in the crimes was coerced by his companion. The jury returned verdicts of guilty on the two murder counts and not guilty on the arson charge. Taylor was again sentenced to life imprisonment on each murder count. However, the judge who presided at the second trial ordered that the terms run consecutively, not concurrently.

Taylor's principal assignment of error is that, on retrial, he was denied his constitutional immunity from double jeopardy by (1) again being charged with first–degree murder for the homicide to which he had pleaded guilty to second–degree murder, and (2) again being charged with arson—that charge having been dismissed with prejudice.

We first consider the refiling of the first–degree murder charges. In *State v. Schoel*, 54 Wn.2d 388, 341 P.2d 481

---

[1] CrR 7.7 was rescinded effective July 1, 1976.

(1959), our Supreme Court expressly overruled *State v. Ash,* 68 Wash. 194, 122 P. 995 (1912) and held that a jury conviction of second–degree murder barred the refiling of a charge of first–degree murder upon retrial. The court adopted the rationale of the United States Supreme Court in *Green v. United States,* 355 U.S. 184, 190, 2 L. Ed. 2d 199, 78 S. Ct. 221, 6 A.L.R.2d 1119 (1957) that when a jury is given the choice of finding an accused guilty of either first– or second–degree murder, a conviction of the lesser degree is an "implicit acquittal on the charge of first degree murder."

Taylor's challenge, however, presents a question of first impression for this jurisdiction: Is the acceptance by the court of a guilty plea to a lesser included offense the constitutional equivalent of a jury's "implicit acquittal" on the greater charge?

■ The precise question has not been considered by the United States Supreme Court. Antithetic conclusions have been reached by jurisdictions which have considered the question. We are persuaded that the better–reasoned decisions are those which hold that the acceptance of a guilty plea to a lesser included offense is not, for double jeopardy purposes, an implicit acquittal on the greater charge.

In *Green v. United States, supra* at 190, Justice Black's graphic rhetoric expresses double jeopardy's philosophical basis.

> Green was in direct peril of being convicted and punished for first degree murder at his first trial. He was forced to run the gantlet once on that charge and the jury refused to convict him. When given the choice between finding him guilty of either first or second degree murder it chose the latter. In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder.

(Footnote omitted.)

Clearly, Taylor was in jeopardy on each of the two murder counts as well as the arson count at the time his first trial was aborted by his bargained pleas.

The beginning point of any analysis of a double jeopardy claim is to determine whether jeopardy has attached. *Illinois v. Somerville*, 410 U.S. 458, 35 L. Ed. 2d 425, 93 S. Ct. 1066 (1973); *State v. Smith*, 15 Wn. App. 725, 551 P.2d 765 (1976). Here, although counsel had not made their opening remarks and no witnesses had been called, jeopardy had nevertheless attached since the jury had been selected and sworn. *Downum v. United States*, 372 U.S. 734, 10 L. Ed. 2d 100, 83 S. Ct. 1033 (1963).

*State v. Eldridge*, 17 Wn. App. 270, 275-76, 562 P.2d 276 (1977). But whether or not the refiling of any of the charges put Taylor in "double" jeopardy must be determined by the nature and quality of the proceeding which terminated his initial jeopardy. "The dispositive question is whether the order of dismissal was tantamount to a 'judgment of not guilty.'" *State v. Jubie*, 15 Wn. App. 881, 885, 552 P.2d 196 (1976).

Although Taylor "was in direct peril of being convicted and punished" on all three counts, he was *not* "forced to run the gantlet" on the question of guilt or innocence. No trier of fact "refused to convict him." *Green v. United States, supra* at 190. We hold that Taylor was not denied his constitutional immunity from double jeopardy by the refiling of the first-degree murder charge.

Taylor also contends that the refiling of the arson charge was prohibited by his constitutional immunity from double jeopardy. He argues that by dismissing the arson charge *with prejudice* "the State forever gave up its rights to proceed against [him]." He further asserts that the fact that the second trial jury found him not guilty of arson is irrelevant "[b]ecause the presence of this charge may have affected the jury's deliberations on the murder charges." We do not agree.

The fact that the State honored its plea bargain and dismissed the arson charge "with prejudice" is not significant. The question of guilt or innocence was never presented to a trier of fact. The dismissal was not "tantamount to a 'judgment of not guilty.'" *State v. Jubie, supra* at 885.

■ Taylor further contends that the refiling of the first–degree murder charge and the arson charge should also be condemned on constitutional "due process" principles. He asks that we order a new trial "with the state limited to charging second degree murder on count I and prohibited from charging arson." As in *Blackledge v. Perry,* 417 U.S. 21, 25, 40 L. Ed. 2d 628, 94 S. Ct. 2098 (1974), Taylor's "due process arguments are derived substantially from *North Carolina v. Pearce,* 395 U. S. 711, and its progeny." The due process principle is summarized in *Blackledge* on page 28:

> A person convicted of an offense is entitled to pursue his statutory right to a trial *de novo,* without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration.

(Footnote omitted.) The key word used by the court is "retaliate." The rule of *Blackledge* is summarized in the following sentence on page 27:

> The lesson that emerges from *Pearce, Colten,* and *Chaffin* is that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of "vindictiveness."

Taylor has pointed to nothing in the record to suggest that the prosecution was motivated by vindictiveness.

> There is no appearance of retaliation when a defendant is placed in the same position as he was in before he accepted [a] plea bargain.

*United States v. Anderson,* 514 F.2d 583, 588 (7th Cir. 1975).

Taylor further asserts that "due process" was denied him when the trial judge determined that the life sentences imposed on the two murder counts should run consecutively rather than concurrently as first imposed. He cites *North Carolina v. Pearce,* 395 U.S. 711, 725–26, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969) for the principle that:

Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

(Footnote omitted.)

Taylor, who has been incarcerated since his conviction, claims that his only "identifiable conduct . . . occurring after the time of the original sentencing proceeding" was "positive, exemplary conduct." He also asserts that the trial judge did not state reasons for the harsher sentences which were based upon objective information concerning Taylor's conduct after the original sentencing.

The holding of *North Carolina v. Pearce, supra* at 723, however, is

that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction. A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." *Williams v. New York,* 337 U. S. 241, 245. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison

record, or possibly from other sources. The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York, supra*, that a State may adopt the "prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime."

 We first point out that the original concurrent life sentences were for first–degree and *second*–degree murder. At trial, Taylor was found guilty on two counts of *first*–degree murder. As the trial judge observed at the time of sentencing, he presided at a full trial and had the opportunity, not afforded the first sentencing judge, to hear the testimony of the witnesses concerning the shocking circumstances of the crime. He characterized the killings as "executions." He had an opportunity to observe Taylor's attitude and demeanor during trial. Our review of the proceedings at the sentencing satisfies us that the trial judge was not motivated by retaliatory vindictiveness. Taylor was not denied due process of law by the imposition of consecutive life sentences.

Taylor contends that the trial judge erred in giving instructions to the jury which permitted his being found guilty *as an aider and abettor*. He asserts that:

Under the instructions, the jury could have believed that all Gary Taylor did was help [his codefendant] under duress, to move the body, or even stand by ready to do so, and still found him guilty. This removes the element of *mens rea*, required by *Boast* [*State v. Boast*, 87 Wn.2d 447, 553 P.2d 1322 (1976)], *J–R* [*State v. J–R Distribs., Inc.*, 82 Wn.2d 584, 512 P.2d 1049 (1973)], and RCW 9.48.030.

We do not agree.

 A similar claim of error was asserted and rejected in *State v. Gibson*, 79 Wn.2d 856, 490 P.2d 874 (1971). *Gibson* holds that the word "abet" includes guilty knowledge or felonious intent. When read together, the instructions given

permitted Taylor to adequately argue that, under the law, he was not an aider or abettor.

Taylor further contends that the instruction given by the trial judge covering his claim that he acted under duress deprived him of a fair trial because it incorrectly stated the law and constituted a comment on the evidence. The instruction was as follows:

> Duress occurs when a person acts only under compulsion and as a result of threats which create a reasonable apprehension in his mind that in case of refusal he is liable to instant death or grievous bodily harm.
>
> I instruct you that duress is not a defense to the crime of murder.

Instruction No. 21.

The instruction is not an incorrect statement of the law. While we observe that the jury might well have been more adequately instructed concerning the defense of duress,[2] the exceptions taken at trial were inadequate for the purpose of preserving the claim of prejudicial error. *Seattle v. Rainwater,* 86 Wn.2d 567, 546 P.2d 450 (1976).

■ Taylor's contention that the instruction constituted a comment on the evidence is likewise without merit. Taylor had proposed an instruction which more accurately paraphrased RCW 9.01.112, but his exception to the failure to give his proposed instruction was only that he had an absolute right to an instruction presenting his theory of the case. The instruction given afforded him that right. *State v. Jordan,* 17 Wn. App. 542, 564 P.2d 340 (1977); *State v. Cox,* 17 Wn. App. 896, 566 P.2d 935 (1977).

Taylor further contends that the trial judge erred in failing to grant him a new trial on the ground of newly discovered evidence.

The circumstances relevant to this issue are as follows: An expert witness called by the prosecution testified that, in his opinion, a palm print on a litter bag found near the

---

[2]The defense of duress at times relevant to the charges against Taylor was governed by RCW 9.01.112. The defense of duress is now covered by RCW 9A.16.060.

body of one of the victims was Taylor's. Subsequent to trial, the prosecution was advised by another expert that, in her opinion, the latent palm print was insufficient in quality or quantity for comparison purposes. The prosecution informed Taylor's counsel of the second opinion.

Taylor moved for a new trial claiming (1) that the second expert opinion constituted newly discovered material evidence which he could not have discovered with reasonable diligence and produced at trial, (2) that the presentation of the discredited testimony by the prosecution denied him due process of law, and (3) that substantial justice had not been done.

■ Although not expressly acknowledged, Taylor's argument impliedly recognizes the basic rule that the "[g]ranting or denying of a motion for a new trial [in a criminal case] based on newly discovered evidence is within the discretion of the trial court and its ruling will not be disturbed on appeal unless an abuse of discretion has been shown." *State v. Pam,* 1 Wn. App. 723, 729, 463 P.2d 200 (1969).

Equally basic is the requirement that the evidence "could not have [been] discovered [by a defendant] with reasonable diligence and produced at the trial" (CrR 7.6(a)(3)) and that, if presented at trial, it would probably have changed the result of the trial. *State v. Letellier,* 16 Wn. App. 695, 558 P.2d 838 (1977).

Taylor relies upon *United States v. Agurs,* 427 U.S. 97, 111, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976) to contend, however, that he should not be required to meet "the severe burden of demonstrating [the] newly discovered evidence probably would have resulted in acquittal" because "the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial." We do not agree.

We first point out that there is no claim that the discrediting evidence was available to the prosecution until after trial. In oral argument, Taylor's counsel candidly

stated to the trial judge that he believed both the prosecution and the expert witness who testified "acted in good faith" and that the dispositive issue was "what is the effect of this erroneous evidence?" On appeal, Taylor has not asserted otherwise. We are not, therefore, concerned with either a willful or negligent violation of a prosecutor's constitutional duty of disclosure. *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); CrR 4.7; *State v. DeWilde*, 12 Wn. App. 255, 529 P.2d 878 (1974). The evidence was of the same category as though it had been discovered from a neutral source after trial. Under these circumstances, the following summary from *United States v. Agurs, supra* at 111–12 expresses the standard which the trial judge was required to apply:

> On the other hand, since we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless–error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his "conviction is sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U. S. 750, 764. Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.

The record of the hearing on Taylor's motion for a new trial discloses that the trial judge was fully cognizant of the appropriate standard to be applied. He reviewed the relevant evidence and pointed out that the palm print related primarily to Taylor's presence at the scene of the crime. He pointed out that Taylor's presence was not an issue. Both Taylor's and his companion's testimony placed him at the scene of the crime. Taylor's defense was culpability, not his absence from the scene of the crime.

After reviewing the relevant evidence, the trial judge stated:

I think I can say that beyond a reasonable doubt, the palm print could not affect the outcome. And I would submit that if you tried this case ten times without that palm print, you would have ten guilty verdicts.

The trial judge did not err in denying a new trial.

Finally, Taylor contends that his initial detention and arrest were unlawful because they were not based upon probable cause; that the search and seizure of incriminating evidence which followed his detention were unlawful; and that the fruits of the search and seizure should, therefore, have been suppressed.

We will not further extend this opinion by detailing all of the circumstances of the arrest and seizure. Taylor's companion was driving Taylor's car at the time of the incident. He was stopped for speeding and failed to produce a valid operator's license. It was 4:30 a.m.

JCrR 2.01(b)(1)[3] provides that an officer may elect to issue a citation for a misdemeanor in lieu of custody. Pursuant to a radio check to ascertain whether the issuance of a citation would be appropriate, the arresting officer received information which gave him reasonable grounds to believe that Taylor and his companion had recently defrauded a restaurant and were fleeing from the scene in violation of RCW 9.45.040.[4]

Ordinarily, an officer may arrest without a warrant only for a misdemeanor committed in his presence. *Cerny v. Smith*, 84 Wn.2d 59, 524 P.2d 230 (1974). In derogation of the common law, RCW 10.31.100 authorizes warrantless

---

[3]In *State v. Hehman*, 90 Wn.2d 45, 578 P.2d 527 (1978), it is prospectively held that a custodial arrest may not be made for a minor traffic violation if the person arrested is willing to be bound by a citation unless the officer has other reasonable grounds apart from the traffic violation to arrest the offender.

[4]RCW 9.45.040 makes it a misdemeanor to, with an intent to defraud, obtain food from a restaurant without paying for it *or to* "abscond" without paying for the food.

probable cause misdemeanor arrests for the "unlawful taking of property . . ." *See State ex rel. McDonald v. Whatcom County Dist. Ct.,* 19 Wn. App. 429, 575 P.2d 1094, *review granted,* 90 Wn.2d 1024 (1978). Believing that he had probable cause to believe Taylor and his companion were guilty of a restaurant "walk–away," the officer advised both that they were under arrest for this offense. The search and seizures which Taylor challenges followed.

Taylor does not challenge the lawfulness of the arrest of his companion for speeding. He contends, however, that the warrantless arrests for the restaurant "walk–away" were unlawful because the crime defined by RCW 9.45.040 involves the theft of "services" rather than "property." He argues that the intent of the legislature is revealed by RCW 9A.56.010(10), which reads in part as follows:

> "Services" includes, but is not limited to, labor, professional services, . . . the supplying of hotel accommodations, restaurant services, entertainment, . . .

■ Taylor reasons that the term "property" in RCW 10.31.100 cannot be properly ascribed to immediately consumable food and drink. We note, however, that RCW 9A.56.010 was enacted after Taylor's arrest and, for the purposes urged by him, would have no retroactive effect. But we need not reach Taylor's contention because the misdemeanor for which he was arrested was committed in the officer's presence. Taylor and his companion were, in fact, *absconding* when they were apprehended for speeding. Their course of travel was from the location of the nearby restaurant, their departure was recent, and they were speeding.

The arresting officer lawfully conducted a patdown search of Taylor's companion incident to his arrest. *State v. Henneke,* 78 Wn.2d 147, 470 P.2d 176 (1970). The search produced three prescription pill bottles from one of his jacket pockets. Each was labeled as a prescription for an individual named "Pierce" and each contained pills. The other jacket pocket held a "quantity of jewelry, including three ladies' watches." Taylor's companion told the officer

that he had purchased the drugs at the restaurant from someone he did not know and had not seen before. The officer then informed him that he was also under arrest for a narcotics violation.

The arresting officer testified that at that point, after having found the prescriptions and the ladies' watches and not having been given a reasonable explanation of "where they came from," he assumed that they had come from a burglary.

When removing Taylor and his companion from the car, the officer had observed an adding machine on the floor in back of the front seat. After finding the drugs and the jewelry, he removed the adding machine to check its serial number for a possible reported theft. When "[i]t came back clear," he returned it to the car and, in doing so, noticed a credit card wallet lying on the seat and another pill bottle on the floor in front of the passenger seat. The wallet held numerous credit cards in the names of the murder victims as did the pill bottle prescription label. After Taylor and his companion were jailed, Taylor's car was impounded. A pistol belonging to Taylor, which later proved to be the murder weapon, was found by the officer who inventoried the evidence produced from a search of the car.

▮ In *State v. Gluck*, 83 Wn.2d 424, 427, 518 P.2d 703 (1974), it is stated

> that common sense dictates that questions involving the searches of motor vehicles or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason what may be an unreasonable search of a house may be reasonable in the case of a motor car.

*Accord, Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978).

The Fourth Amendment right, which Taylor asserts, protected him only from "unreasonable" searches and seizures. As stated in *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975),

reasonableness . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

A review of the record reveals that at each juncture in the rapidly developing investigation beginning with the arrest of Taylor's companion for speeding, the police officers carried out their responsibilities in a careful and responsible manner. When the evidence is considered in its entirety, it is clear that the search of Taylor's car and the subsequent seizure of evidence were not unreasonable.

Taylor was convicted at a fair trial. He was denied none of his constitutional rights.

Affirmed.

FARRIS, C.J., and SWANSON, J., concur.

Reconsideration denied March 29, 1979.

Review denied by Supreme Court June 15, 1979.