[No. 6783–4–I.   Division One.   April 28, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. CLELL
JONES, *Appellant.*

*Dean R. Sargent,* for appellant (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Robert J. Conklin, Deputy,* for respondent.

SWANSON, J.—Clell Jones appeals a judgment and sentence entered upon his conviction by a jury of first–degree murder. His principal contentions on appeal are that the trial court erred in (1) declaring a mistrial in violation of the double jeopardy clause, (2) permitting the information

against Jones to be amended, and (3) allowing a statement to be admitted into evidence under the excited utterance exception to the hearsay rule. We affirm.

Jones was originally charged with second–degree murder, RCW 9A.32.050(1)(a), but after the jury was impaneled and sworn, the State discovered new evidence and moved to amend the information to charge first–degree premeditated murder and first–degree felony–murder. The alleged underlying felony was first–degree rape. Jones opposed the motion, arguing that he would be prejudiced in the presentation of his case if amendment were allowed at that point in the proceedings. Jones also expressed dissatisfaction with his attorney and requested substitute counsel.[1]

The court tentatively indicated that both the State's motion to amend and the defendant's motion to substitute counsel should be granted and suggested a mistrial might be required. The State opposed a mistrial and argued that a continuance was the proper course of action. Jones, while maintaining his objection to the amendment, agreed that, if it were allowed, a continuance would be necessary.

During the argument, the bailiff informed the court that a juror had overheard a comment by a person the juror believed to be a prospective witness. The overheard comment was, "If he's not convicted, I'll have to move to Cuba." Examination of this juror revealed that no other juror had overheard or been told about this statement.

---

[1] The record is clear that Jones' request for substitute counsel was not induced by the State's motion to amend; his dissatisfaction with his attorney concerned other matters. Jones knew, moreover, that his request for new counsel made the granting of the motion to amend more likely. In presenting Jones' request to the court, his counsel stated:

I have advised him that if [new counsel is appointed], any lawyer would need more time, and if more is given to a new lawyer regarding the preparation of a case, then, the chances would be greatly increased that the Court would allow an amendment, because there would be sufficient time, then, for a new lawyer not only to become familiar with the case, but be able to be prepared to represent him on a first degree murder charge. So he understands the risk in that regard.

The trial court deferred ruling on any of these issues until all had been raised. Ruling first on the motion to amend, the court granted the motion and Jones was arraigned on a charge of first–degree murder. RCW 9A.32-.030(1)(a) and (c). Next, on the motion to substitute counsel, the court found serious conflicts between Jones and his attorney and instructed the director of the Office of Public Defense to secure a new lawyer for Jones. Turning then to the question of the juror who overheard the statement, the court concluded "he would not be a proper juror" and would have to be excused from the panel. No alternate jurors had been selected, so the panel was reduced to 11 people.

The trial judge then sua sponte declared a mistrial, concluding that the interests of justice required such action because (1) the charge was amended to first–degree murder, (2) time was required for substitute counsel to prepare Jones' defense, and (3) the trial could not proceed with an 11–person jury. Prior to the second trial, Jones' motion to dismiss on the basis of double jeopardy was denied.

Jones first contends that constitutional double jeopardy principles require dismissal of the charge against him because there was no manifest necessity to declare a mistrial.

▪ Under the United States Constitution and our state constitution, no person may be twice placed in jeopardy for the same offense. *State v. Eldridge,* 17 Wn. App. 270, 562 P.2d 276 (1977). The purpose of the double jeopardy clause has been explained as follows:

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . .
>
> . . .
> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to

embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 2 L. Ed. 2d 199, 78 S. Ct. 221, 61 A.L.R.2d 1119 (1957).

■■ We note initially that jeopardy had attached in this case as the jury had been impaneled and sworn. *State v. Eldridge, supra.* The attachment of jeopardy does not automatically preclude the discharge of that jury, but a new trial before another jury is permitted only where "there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165 (1824). We are mindful of the holding in *United States v. Jorn,* 400 U.S. 470, 485, 27 L. Ed. 2d 543, 91 S. Ct. 547 (1971) that:

[i]n the absence of [a motion by the defendant for mistrial], the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option [to have his case tried before a particular tribunal] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.

Careful scrutiny of a mistrial is required where there is evidence of bad faith conduct by judge or prosecutor or there is any reason to believe the superior resources of the State are being used to harass or achieve a tactical advantage over the accused. *Arizona v. Washington,* 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824 (1978). Absent such evidence, however, a trial court's finding of manifest necessity should be accorded the highest degree of respect. *Arizona v. Washington, supra; State v. Eldridge, supra.*

No mechanical rules exist for evaluating a claim that in a particular case the trial court abused its discretion to declare a mistrial. *United States v. Jorn, supra; State v. Eldridge, supra.* Here, Jones moved to substitute counsel and persuaded the trial court that conflicts with his trial attorney warranted such relief. Granting the motion protected Jones' fundamental rights to counsel and a fair trial.

To protect those rights, an indefinitely long delay of the trial was inevitable under the facts of this case. Complicating the situation was the possibility Jones might not approve proceeding with only 11 jurors. *See* CrR 6.1(b)(2). Assuming such approval were given, continuing the case would then have been literally or technically possible. The uncertainty, however, about when new counsel could be ready for trial and the likelihood of additional continuances created a grave risk that the remaining jurors would be prejudiced against either Jones or the prosecution. This inevitable delay and risk of prejudice sustain the trial court's declaration of a mistrial even though a continuance might have been technically possible. *Arizona v. Washington, supra.* The granting of Jones' motion to substitute counsel did, under the facts of this case, warrant the trial court's scrupulously considered decision to declare a mistrial.[2]

Jones also challenges the trial court's decision to allow the information to be amended to charge first–degree murder.

CrR 2.1(d) states:

The court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

A defendant cannot claim error from the amendment of an information unless he can show he was prejudiced thereby. *State v. Brown,* 74 Wn.2d 799, 447 P.2d 82 (1968).

The amendment of the information in the instant case did not prejudice Jones and was, therefore, proper. An amendment to an information at trial may prejudice a defendant by leaving him without adequate time to prepare a defense to a new charge. *See State v. LaPierre,* 71 Wn.2d 385, 428 P.2d 579 (1967). Because the trial court declared a mistrial almost immediately after granting the State's

---

[2]In light of our holding, we do not address the sufficiency of the court's other reasons for granting a mistrial. We wish to emphasize, however, that manifest necessity for a mistrial existed independently of the granting of the motion to amend the information against Jones.

motion to amend, Jones and his counsel had ample opportunity to prepare his defense to the new charge. The declaration of a mistrial prevented any prejudice that the amendment, in a different context, might have caused the defendant.

Jones next assigns error to the admission of a statement at trial. Cross-examination of a State witness, Llewellyn Thomas, Jr., an employee of the hotel where the homicide occurred, concerned the reaction of a George Nixon when he and Thomas discovered the victim's body in Nixon's hotel room. The following exchange occurred between defense counsel and Thomas:

Q. How did George [Nixon] react when you saw him . . .? What was his reaction?

A. When I first met him it was just a normal reaction. Once he asked me to open [the door to Nixon's room], that's when he went to hoo hawing and raving a little bit.

Q. What do you mean, hoo hawing and raving? Was he excited?

A. Yeah.

On redirect examination, over objection, the prosecuting attorney asked Thomas to clarify his testimony:

Q. Would you explain to the jury what happened when you started to enter the room?

A. He [Nixon] was raving and hollering about this Jones guy. . . .

. . .

Q. You said that he started to say something about Jones. Do you remember what he said?

A. He said this Jones guy—he was raving about him. So that's when I was telling him that he didn't have no business letting nobody use his room because that's against the hotel policy.

Both Nixon and Jones were arrested on suspicion of this murder, and after Jones was charged, Nixon disappeared and was unavailable to be examined at trial. The court ruled Thomas' statement about Nixon's reaction upon discovering the body ("raving and hollering about this Jones guy") was admissible under the excited utterance exception

to the hearsay rule. Jones argues that the statement was inadmissible hearsay.

Statements relating to a startling occurrence or event, otherwise inadmissible as hearsay, are admissible if they meet the criteria of the excited utterance exception. *Beck v. Dye,* 200 Wash. 1, 9–10, 92 P.2d 1113, 127 A.L.R. 1022 (1939). Jones objects that Nixon's statement is inadmissible under this exception because it is a statement of opinion, that Jones was the murderer, rather than a statement of fact. *See Beck v. Dye, supra.* Thomas' testimony about his response to Nixon's "raving and hollering," however, discloses not that Nixon had accused Jones of the murder but that he had merely told Thomas that he had allowed Jones to use his hotel room. This is a statement of fact, not opinion. The statement likewise satisfies the other elements of the excited utterance exception. Therefore, assuming Nixon's statement was hearsay, *i.e.,* that it was offered to show the truth of the matter asserted in the statement, it was properly admitted under this exception.

Nixon's statement was also admissible, however, on nonhearsay grounds, as evidence of Nixon's state of mind. *See State v. Haga,* 13 Wn. App. 630, 536 P.2d 648 (1975), *cert. denied,* 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1740 (1976); 5 Wash. Prac. 389 (1965). Cross–examination of Thomas elicited the testimony that Nixon was "raving" and "excited" upon seeing the victim's body in his room. Jones' apparent theory of the case was that someone else, possibly Nixon, was the murderer. Had the prosecution not been permitted to explore Nixon's reaction further, the defense would have been free to draw the inference in closing argument that Nixon's behavior betrayed a guilty mind. Redirect examination, revealing the reason for Nixon's excitement, brought Nixon's state of mind into clearer focus.

This analysis is consistent with the general rule that a party may examine a witness within the scope of the opposing party's previous examination of that witness. *State v. Gefeller,* 76 Wn.2d 449, 458 P.2d 17 (1969).

It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it.

*Gefeller, supra* at 455.

Even if admission of Nixon's statement were error, however, that error would be harmless. The statement "raving and hollering about this Jones guy" falls far short of an accusation against Jones. Indicative of the statement's lack of prejudicial effect is the fact that the prosecution did not mention it in closing argument. Other evidence against Jones, on the other hand, was overwhelming. Testimony established that, on the day of the murder, Jones and the victim were together in Nixon's hotel room and Jones later was seen pursuing a partially clad woman down a corridor of the hotel. A quantity of physical evidence—hair, blood, semen, and food particles—linked Jones to the murder. Jones' alibi defense was effectively discredited by the prosecution. Under these circumstances, Jones would have been convicted even if Nixon's statement had not been admitted. Therefore, if admission of the statement were error, that error would not be prejudicial. *State v. Martin,* 73 Wn.2d 616, 440 P.2d 429 (1968).

The remaining issues raised by Jones are without merit.[3]

---

[3]Jones, pro se, filed a supplemental appellant's brief and a statement of additional authorities. In his pro se brief, Jones argues that the actions of his present court-appointed attorney on appeal have denied him effective assistance of counsel. We disagree. Appointed counsel on appeal has a duty to raise and conscientiously advocate nonfrivolous arguments on behalf of his client. *Anders v. California,* 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1966). Failure of counsel to uphold this duty may constitute a denial of a defendant's right to effective assistance of counsel. *See High v. Rhay,* 519 F.2d 109 (9th Cir. 1975). Jones points to his present counsel's failure to file a reply brief on his behalf. We note, in addition, that Jones' present counsel waived oral argument of his client's case before this court. Counsel's actions are sufficient reason to question his commitment to his client's defense and have made the task of this court more difficult. Fortunately, however, Jones' previous counsel on appeal had earlier filed a 42-page brief that adequately raised and argued the issues central to Jones' defense. For that reason, we find that Jones' right to effective assistance of counsel on appeal has not been denied. *See Anders, supra; High, supra.*

The judgment is affirmed.

DORE, J., concurs.

RINGOLD, J. (dissenting)—I respectfully dissent. While I agree that under the facts of this case the substitution of counsel creates a manifest necessity for a mistrial, I reach that conclusion only by construing CrR 2.1(d) to limit the State to a prosecution for second–degree murder. I also cannot accept the majority's disposition of the evidentiary issue which arose during the testimony of Llewellyn Thomas.

### AMENDMENT OF THE INFORMATION

The original information charged Jones with second-degree murder, alleging an intentional slaying. The amendment to first–degree murder charged a more serious offense. The new information alleged both a premeditated, intentional killing and felony–murder based upon an alleged rape. Not only did Jones face the additional time to prepare to meet these new allegations, but he also was confronted with a jury which had been impaneled and sworn without being examined on possible bias concerning the new and more serious charges. An amendment at that time was erroneous and prejudicial. *See State v. Olds*, 39 Wn.2d 258, 235 P.2d 165 (1951); *see also* 42 C.J.S. *Indictments and Informations* § 240, at 1251–52 (1944). While I agree with the majority that the mistrial eliminated the foregoing prejudice, I conclude that the erroneous amendment is so

---

Another issue raised by Jones in his pro se brief concerns his request for the transcription and production of verbatim reports of proceedings in the trial court. This matter is also addressed in an "Application for Writ of Mandamus," cause No. 8421–6–I, which is hereby consolidated with this cause. *See* RAP 3.3(b).

Citations in Jones' pro se brief and statement of additional authorities indicate he had access to the verbatim reports of proceedings in his case. His request for production of these documents, therefore, has apparently been satisfied.

closely connected with the mistrial[4] that the possibility of violating Jones' double jeopardy rights requires limiting the State to a second–degree murder prosecution.

The majority correctly states that where "there is any reason to believe the superior resources of the State are being used to harass or achieve a tactical advantage over the accused," the mistrial must be carefully scrutinized. From the record, two critical queries relevant to a claim of an unfair tactical advantage for the State cannot be answered. First, would Jones have continued to pursue his motion to substitute counsel if the court had ruled properly and refused to consider amending the information? Second, would the trial court have allowed substitution of counsel if the motion to amend had been denied? These questions do not imply bad faith conduct by judge or prosecutor, but they disclose the significance of the close connection between the erroneous amendment and the mistrial. If the trial court had ruled properly and denied the motion to amend, a negative answer to either question would have made a mistrial improper[5] and required a trial on second–degree murder. I, therefore, have reason to suspect that the superior resources of the State were used to achieve a tactical advantage over the accused. The erroneous amendment allowed the State to pursue a more serious charge which, under one allegation, could be proven without the element of intent to kill. The possible tactical advantage is that the lesser charge of second–degree murder might have been all that Jones would have faced if the trial court had not erroneously granted the motion to amend.

---

[4]Jones' motion to substitute counsel and the State's motion to amend were considered in the same hearing. The trial court cited the amendment as one of its reasons for granting the mistrial.

[5]The only remaining reason for the mistrial, the loss of one juror, would not sustain a mistrial unless the court first inquired into the accused's willingness to proceed with 11 jurors. *Parker v. United States,* 507 F.2d 587 (8th Cir. 1974), *cert. denied,* 421 U.S. 916, 43 L. Ed. 2d 782, 95 S. Ct. 1576 (1975).

The remedy is found in CrR 2.1(d). This rule bars amendments which prejudice substantial rights of the accused. Jones has a substantial right to be tried by the first jury he chooses without the State's use of its superior resources to gain a tactical advantage and secure a mistrial. The erroneous amendment and subsequent mistrial may have denied Jones this right.[6] Because we do not know that this right was denied, we need not dismiss the case. The possibility of its denial, however, requires construing CrR 2.1(d) to bar the State from ever amending the information. Only then can I conclude that the State secured no unfair tactical advantage from the erroneous amendment and subsequent mistrial.

## THOMAS' TESTIMONY

Llewellyn Thomas testified that he was employed by the Morrison Hotel at the time of the murder. One of his duties was to unlock doors to rooms provided for transients. George Nixon was a registered guest who sought Thomas' assistance to get into his room. When Thomas opened the door, he and Nixon immediately observed the victim's body.

During cross-examination by the defense, Thomas testified to Nixon's excited reaction to the discovery of the body. On redirect examination by the State, Thomas testified that upon observing the body, he asked Nixon "what was going on." Before Thomas could describe what Nixon told him, the court responded to a defense objection by tentatively indicating the testimony was admissible as a spontaneous utterance. The court then heard arguments in a side-bar conference. After the off-record conference, the prosecutor was allowed to continue her examination of the witness:

---

[6]The prosecutor was wary of a mistrial and sought a continuance. The trial court, however, also has a responsibility to protect the accused's rights under the double jeopardy clause.

Q: Mr. Thomas, you were indicating that as you opened the door and Mr. Nixon looked in, you said that something was said. Would you explain to the jury what happened when you started to enter the room?

A: He was raving and hollering about this Jones guy. Well, I didn't even know who this Jones guy was.

[Defense counsel]: If the Court please, for the record, since we had a sidebar conference, I'm going to object to this testimony on the basis of hearsay and on the basis that Mr. Nixon isn't even available for me to cross—examine to go into this issue. I think it is entirely inappropriate to allow this witness to testify relative to conclusions, to hearsay, and especially when the person who is supposed to have said this isn't available for cross—examination.

THE COURT: We'll note the objection. Proceed.

Q: [By the prosecutor] You said that he started to say something about Jones. Do you remember what he said?

A: He said this Jones guy—he was raving about him. So that's when I was telling him that he didn't have no business letting nobody use his room because that's against the hotel policy. So from that point, that was all we talked about, this Jones guy. I kept on trying to ask him what Jones and he kept on telling me, "A tall guy. A tall guy." So I thought it was someone else. Personally, that's what I thought. I didn't know who it was, because I never known no Jones guy by name. You see faces, folks in and out there all the time.

The majority holds that the evidence was admissible under the excited utterance exception to the hearsay rule. To satisfy the requirements of that exception, the offered evidence must possess at least the following essential elements:

(1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration

or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

*Beck v. Dye,* 200 Wash. 1, 9–10, 92 P.2d 1113, 127 A.L.R. 1022 (1939); *Makoviney v. Svinth,* 21 Wn. App. 16, 20–21, 584 P.2d 948 (1978). *See also* ER 803(a)(2) and comment. Nixon's statement, to which Thomas testified, is not an excited utterance because it does not satisfy the third and sixth requirements of *Beck v. Dye, supra.* The statement was an expression of opinion, not fact, concerning Jones' involvement in a murder not witnessed by the declarant.

The majority concludes the statement was an expression of fact because it showed the room was loaned by Nixon to Jones. To the extent this inference can be drawn, it fails to satisfy the first two requirements of *Beck v. Dye, supra.* It does not relate to the main event, and it is a narrative of a past completed affair. Further, this inference is but the first step in a logical progression to the inference that Nixon believed Jones committed the murder. There was also other evidence to prove Nixon loaned his room to Jones, so the prejudicial impact of the statement far outweighed its probative value.

The majority next concludes the statement was admissible as circumstantial evidence of the declarant's state of mind. I cannot agree. When the declarant's state of mind is relevant, statements tending to prove it are not hearsay and may be admissible. *State v. Haga,* 13 Wn. App. 630, 536 P.2d 648 (1975), *cert. denied,* 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1740 (1976); 5 R. Meisenholder, *Evidence Law and Practice* § 383, at 387 (1965). Nixon's state of mind, his surprise and excitement, was relevant only as it tended to show he was not involved in the murder. This purpose was satisfied by the statement of excitement admitted during cross–examination without reference to

Jones. It strains credulity to assert that Nixon's excited reaction would support a logical inference "that Nixon's behavior betrayed a guilty mind." Contrary to the majority's opinion, the excited reaction was a normal response to a grisly murder scene. Admission of the same statement with the addition of the reference to Jones did not shed any new light on Nixon's state of mind. Being cumulative on the issue of the declarant's state of mind, its prejudicial effect far outweighed its probative value.

I must also reject the majority's conclusion that further inquiry into the reason for Nixon's excitement was permissible. I agree that an explanation would be warranted if Nixon's excited reaction were helpful to the defense, but as already discussed, no such advantage could be inferred from Nixon's expected excitement. The issue of Nixon's opinion as to Jones' guilt was not opened up by this or any other testimony elicited by the defense. It was entirely outside the scope of cross–examination and should have been excluded. *State v. Gefeller,* 76 Wn.2d 449, 458 P.2d 17 (1969).

Harmless error is the majority's final refuge. The opinion concludes that Nixon's statement fell short of an accusation against Jones. Not only was the statement made upon Nixon's observation of the body, but afterwards, all he and Thomas talked about was "this Jones guy." A fact finder could only conclude that Nixon believed Jones committed the murder. This accusation was the only direct evidence against Jones. It was a self–serving statement made by an unavailable suspect who had initially been arrested for the slaying because the body was found in his room. The governing rule was formulated in *State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968):

A prejudicial error may be defined as one which affects or presumptively affects the final results of the trial. *State v. Britton, supra. When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error*

*may not be deemed harmless, and the defendant's right to a fair trial requires that the verdict be set aside and that he be granted a new trial.* But, where the defendant's guilt is conclusively proven by competent evidence, and no other rational conclusion can be reached except that the defendant is guilty as charged, then the conviction should not be set aside because of unsubstantial errors.

(Italics mine.)

I do not possess the omniscience to say from this record whether Jones would or would not have been convicted but for the admission of this evidence. The fact that the prosecution did not dwell on Nixon's excited reaction in closing argument reveals nothing about the impact the testimony had on the jury. I cannot say that the jury would have found the defendant's guilt conclusively proven by the remaining competent evidence. I cannot conscientiously sustain a verdict which may well have been influenced by such erroneously admitted evidence. *State v. Irving,* 24 Wn. App. 370, 601 P.2d 954 (1979).

For the foregoing reasons, I would reverse and remand for trial on second–degree murder.

Reconsideration denied June 11, 1980.

Review denied by Supreme Court October 10, 1980.